UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                        )
RAINSOFT, a division of Aquion, Inc.,   )
a Delaware corporation,                 )
                                        )   C.A. No. 15-432 WES
          Plaintiff,                    )
                                        )
     v.                                 )
                                        )
BRIAN MACFARLAND, d/b/a "Lazy Man       )
& Money,"                               )
                                        )
          Defendant.                    )
_____ )

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

     Brian MacFarland is the author of a series of blog posts
criticizing the water-treatment company RainSoft.  RainSoft has
sued over these posts, alleging defamation and violation of the
Lanham Act.  MacFarland argues his posts are shielded by the First
Amendment, and indeed successfully executes a "rolled-up plea":
when not protected opinion, they are substantially true.  See
Black's Law Dictionary 1270 (9th ed. 2009).

I.   Background

     MacFarland runs the website lazymanandmoney.com, where he
blogs about companies who provide consumer products and services,
with an eye toward saving his readers money.  (See Def.'s Statement
of Undisputed Facts ("DSUF") ¶¶ 1-3, ECF No. 88.)  MacFarland set
his sights on RainSoft starting in summer 2013, after he and his

wife sat through an in-home demonstration of RainSoft's water-treatment products. (Id. ¶¶ 9, 19, 24.) The demonstration was conducted by Gus Oster. (Id. ¶¶ 24–25.) Employed by Basement Technologies, a local RainSoft-products dealer, Oster pitched the MacFarlands according to a script written by RainSoft. (Id. ¶¶ 24–27.) The script repeatedly touted RainSoft as a maker of premier water-treatment products, without mention of Basement Technologies, a priority that tracked the companies' business plan. (See, e.g., id. ¶ 27; DSUF Ex. G at 25–27, ECF No. 88-7.)

Their arrangement was, broadly, to make sales by foregrounding RainSoft's brand name and reputation. (See DSUF Ex. U at 2–7, ECF No. 88-21.) The preface to the companies' dealership agreement stated, "[I]t is expected that [Basement Technologies] will protect and embrace the RainSoft®-brand as we all make a living based on its reputation in the marketplace." (Id. at 2.) RainSoft trusted Basement Technologies to "[p]romot[e] the RainSoft®-brand in every customer facing opportunity," so that eventually "every person in the world [would] recognize the RainSoft® trademark." (Id. at 2; DSUF Ex. V at 26, ECF No. 88-22.) RainSoft and Basement Technologies also agreed that "all consumers who purchase RainSoft®-brand products . . . from [Basement Technologies] shall be considered the shared customers

of AQUION, INC[.]¹ and [Basement Technologies] . . . and that neither . . . has . . . any . . . superior right, interest[,] or ownership in, or control of, such customers . . . ." (DSUF Ex. U at 6.)

The agreement went on to stipulate that Basement Technologies could not "sell, service, rent, promote, lease[,] or install products" other than RainSoft's without RainSoft's permission, (id.), which was never granted, (Pl.'s Statement of Disputed Facts ("PSDF") ¶ 143, ECF No. 109.)  It also defined "[t]he proper way for a[] [dealership] employee to greet customers when answering the phone": "Hello, ABC Water Company, your local RainSoft Dealer." (DSUF Ex. V at 24 (emphasis omitted).)  Ultimately, the "spirit of this agreement" was for Basement Technologies to operate under RainSoft's aegis, and as closely as possible without merging into a single entity.  (DSUF Ex. U at 2.)  In other words, as the agreement's preface provided, addressing Basement Technologies, "You are becoming part of an organization that expects and counts on your participation and support . . . ."  (Id.)

Though MacFarland was not privy to the companies' agreement, his first RainSoft post, regarding the in-home presentation, showed that Oster had accurately conveyed its essence.  Titled "Is

---

¹ Aquion, Inc., is RainSoft's parent company.  (DSUF ¶ 42.) Because neither party argues the difference between Aquion and RainSoft matters to the outcome here, the Court uses them interchangeably, so as not to confuse its readers.

Home Depot's Water Test from RainSoft a Scam?" the post mixed narration – "The salesman was super nice, and very friendly with our dog." – and critique of Oster's presentation. (Pl.'s Statement of Undisputed Facts ("PSUF") Ex. A at 2–5, ECF No. 106-1.) The latter consisted of calling the in-home presentation a "magic show" and accusing RainSoft of making "false promises," using "high-pressure sales tactics," and other "slightly deceptive practices." (Id.) MacFarland referred by "magic show" to various acts Oster performed ostensibly showing RainSoft's products purifying the tap water in MacFarland's home. (Id. at 2–3.) MacFarland wondered if Oster had something up his sleeve: "I love to think about how, if I wanted to be devious, I could pull it off. For example, the bottles he brought with him that were labeled for our water could have been laced with contaminants. I'm not saying they were, but it's possible." (Id.) "As you can tell," MacFarland wrote, "I'm a skeptical person by nature." (Id. at 2.)

The "false promises" MacFarland attributed to Oster included that RainSoft's filtration system would save him $20,000 in appliance-replacement costs over 20 years – this MacFarland "highly doubt[ed], exclaiming, "Wholy [sic] statistics gone wrong, Batman." (Id. at 3.) MacFarland took Oster to task too for what he considered "high-pressure sales tactics," such as offering five years of free soap if MacFarland purchased a RainSoft system on the spot. (Id. at 4.) Because it did not include the cost of

labor, MacFarland also found RainSoft's lifetime warranty deceptive: "[i]f I have a lifetime warranty and it costs me $80 a month for repeated maintenance," he reasoned, "what is the warranty actually giving me?" (Id.)

In this first post, MacFarland concluded not that RainSoft was a scam, but that its products were not worth their price: "I don't want to say that the RainSoft EC4 product doesn't work. . . . From what I'm reading though, the quality is closer to mid-level, but it is really high-priced . . . ." (Id. at 5.) He ended the post by asking his readers if they had "ever installed a water purification system? . . . Was it RainSoft?" (Id.) Despite his skepticism, however, MacFarland and his wife – who MacFarland "recognized . . . was impressed by the product" – gave Oster a $100 check to keep the free-soap option open.[2] (Id.)

Published eight days later, MacFarland's second RainSoft post – "RainSoft Scam? (Part 2)" – updated readers on his "ongoing efforts to get healthy water in [his] home." (PSUF Ex. B at 1, ECF No. 106-2.) MacFarland relayed a conversation he had had with a "RainSoft representative" in which MacFarland haggled $1,000 off

---

[2] MacFarland added several updates to this article years after its initial publication. In these updates, MacFarland variously linked to his and others' articles he thought corroborated his assessment of RainSoft; reported that RainSoft had sued him over the article; and asked his readers to help pay his attorneys' fees. (PSUF Ex. E at 5-6, ECF No. 106-5; PSUF Ex. G at 2, ECF No. 106-7; PSUF Ex. I at 3, ECF No. 106-9.)

the price Oster quoted him. (Id.) He also told of a trip he made to Lowes where a "representative in plumbing was shocked" that Home Depot – who had introduced MacFarland to RainSoft's products – would "only connect [MacFarland] to this shady RainSoft company," rather than show him "a range of filtration systems from various manufacturers." (Id.) MacFarland again mentioned Oster's "magic tricks" and "bad logic," before answering the titular question – "RainSoft Scam?" – by saying he was "leaning towards yes, but you are free to make your own decisions." (Id. at 3.)

MacFarland was less equivocal in his next post, "Yep. RainSoft Scammed Me Out of $100." (PSUF Ex. C at 2–3, ECF No. 106-3.) There MacFarland reported that Oster cashed the $100 check that had held open the free-soap option, contrary to MacFarland's expectations of their agreement, which was that MacFarland would be able to cancel the check any time. (Id.) MacFarland warned his readership that "if you suspect a company to be a scammer, don't even give them an inch, they'll take a mile." (Id. at 3.) He later added an update to the top of this post, reporting that "RainSoft's parent company, Aquion, saw this and . . . sent me a $100 check to make it right." (Id. at 2.)

The fourth of MacFarland's posts panning RainSoft was published over a year later, on December 9, 2014. (PSUF ¶ 148, ECF No. 110; PSUF Ex. D at 1, ECF No. 106-4.) "How to Get Clean, Purified Water (at [t]he Best Price)" recounted a spat MacFarland

had, in the comments section of one of his other RainSoft posts, with someone he suspected was, though who denied being, a RainSoft dealer; MacFarland discounted the commenter's glowing RainSoft review because of this supposed bias, accusing the supposed dealer of engaging in a "comment scam." (<u>Id.</u> at 2, 4.) The post also rehearsed MacFarland's previous complaints about RainSoft and added another about the vagueness of RainSoft's guarantee that if a customer finds a better-performing product, the customer keeps the RainSoft system gratis. (<u>Id.</u> at 2–4 ("There's no real fine print[,] . . . and the terms are ambiguous . . . .").) MacFarland then summoned "a little common sense" to piece together a "formidable water purification system" – hyperlinking to other companies' products – "[t]hat's less than 1/6th the cost of what RainSoft was going to charge." (<u>Id.</u> at 4–5.) "I'm not a water purification expert," MacFarland wrote, "but I know basic problem solving, scientific process, and consumer scams . . . ." (<u>Id.</u> at 5.)

Readers were able to comment on each of MacFarland's four RainSoft posts. (<u>See, e.g.,</u> <u>id.</u> at 8–19.) And MacFarland commented back, dozens of times, usually to agree with those who agreed with him. (<u>See, e.g.,</u> PSUF Ex. O at 33, ECF No. 106-15 ("Thanks[,] Josh. Your story is exactly the point I've been trying to make.").) Or to trade barbs with those who did not. (<u>See, e.g.,</u> <u>id.</u> at 2, 7, 34 ("Clearly paying $5,000 or $10,000 for soft

7

water is going to lead to soap savings that will help you retire 20 years early."; "Doug, [w]ith all due respect, I believe your intentions were slimy."; "No I hadn't heard of 'Kratt foods.' If you are going to be sarcastic about it, at least get the spelling right."). MacFarland also reiterated in the comments his position that "RainSoft salesmen" were "selling fear" via "scammy sales tactics" and "magic shows." (Id. at 2, 9, 20.)

After RainSoft initiated this lawsuit in April 2015, MacFarland posted "What is a Scam Anyway?" in which he explained that when he uses the word 'scam' he does not necessarily mean to connote illegal activity, but instead, more colloquially, a "confidence trick." (PSUF Ex. F at 2-4, ECF No. 106-6.) He argued this interpretation was consistent with the "conversational tone" he uses on his site, "a reflection of what [he]'d say to a friend, a colleague, or anyone else if they asked [him] about [his] opinion on something." (Id. at 2.) MacFarland's reluctance to make legal claims stems, he said, from the fact that he does not "possess a 100% understanding of all laws." (Id. at 3.) "I don't even think judges know ALL laws," he ventured.[3] (Id.)

MacFarland's etymological foray was not happenstance, it turned out. Discovery turned up the fact that MacFarland penned

---

[3] A defamatory, yet substantially true statement if ever there was.

8

"What is a Scam Anyway?" to "cover [his] ass." (PSUF Ex. R at 29, ECF No. 110-2.) That is, to circumvent precedent, as MacFarland saw it, in Illinois – where this case was originally brought – that treated the word 'scam' as "libel per se." [4] (Id.) Discovery also made manifest that MacFarland knew by the end of August 2013 – after he had written the first three RainSoft posts, but before publishing "Yep. RainSoft Scammed Me Out of $100." – that Basement Technologies and RainSoft were distinct entities, and that Oster worked for the former. (PSUF Ex. P at 15, ECF No. 110-1 ("Q. [Y]ou underst[ood] based on this [August 29, 2013,] email that RainSoft's dealers are independently owned, right? A. . . . yes.").)

---

[4] MacFarland made these and other admissions in emails RainSoft requested in discovery, but did not receive until the night before RainSoft's summary-judgment brief was due. While ultimately having no effect on the merits of this case, the emails were discoverable, see Fed. R. Civ. P. 26(b)(1), and should have been turned over much sooner. (See Pl.'s Mot. to Compel More Responsive Answers to Interrogs. & Reqs. for Produc. Ex. G at 5, ECF No. 54-7 (writing to defendant on July 8, 2016, that "[i]t is implausible that Mr. MacFarland has no other communications" relating to RainSoft).) The timing of their disclosure bespeaks a gamesmanship the Federal Rules of Civil Procedure seek to prevent and something this Court will not tolerate. See Fed. R. Civ. P. 26(e) (explaining duty to supplement discovery responses). RainSoft's Motion for Sanctions (ECF No. 119) is therefore GRANTED in part: MacFarland shall pay the reasonable expenses, including attorneys' fees, RainSoft incurred writing its sanctions motion and reworking its summary-judgment brief. See Fed. R. Civ. P. 37(c); Primus v. United States, 389 F.3d 231, 236 (1st Cir. 2004) (upholding Rule 37 sanctions where movant "had prepared a summary judgment motion in reliance on [non-movant]'s earlier[, incomplete] disclosure of her expert evidence").

And, in fact, when viewed in the light most favorable to
RainSoft, the evidence shows MacFarland understood this to be true
from the very beginning: the aforementioned $100 option check was
made out to Basement Technologies – though its memo section read,
"deposit-rainsoft" – (DSUF Ex. H at 2, ECF No. 88-8), and
MacFarland had written in an April 29, 2015, email that "[t]he
reason why I didn't mention the local dealer [is] it gives away
the fact that I'm in Rhode Island and I try to hide that a bit due
to the MLM stuff."[5] (PSUF Ex. R at 9.) He continued, "I try to
write for a national audience and from what I've read online my
experience [with in-home demonstrations of RainSoft products]
happens across the country." (Id.) MacFarland admitted that
RainSoft had "a point" when it attempted to educate him on the
finer points of its relationship with Basement Technologies. (Id.
at 23.) "[B]ut for the most part," MacFarland decided, "it is
bullshit." (Id.)

II. Discussion

RainSoft's complaint alleges defamation and a Lanham Act
violation. (Second Am. Compl. ("SAC") ¶¶ 45–59, ECF No. 44.)
MacFarland has moved for summary judgment as to both (Def.'s Mot.
for Summ. J. 1, ECF No. 85); RainSoft has cross-moved for summary

---

[5] "MLM stuff" refers to death threats MacFarland reported
receiving in response to his posts concerning so-called multi-
level-marketing companies. (Def.'s Statement of Disputed Facts
Ex. AA at 2-3, ECF No. 115-1.)

judgment on its defamation count as to two of MacFarland's RainSoft posts (Pl.'s Mem. of Law in Resp. to Def.'s Mot. for Summ. J. & in Supp. of Cross-Mot. for Partial Summ. J. 1-3, ECF No. 112.) The Court decides these motions by first answering whether the record, construed in favor of the non-movant, contains a genuine issue of material fact, and if not, whether the law entitles the movant to judgment. See Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 20-21 (1st Cir. 2018).

A. Defamation

RainSoft claims MacFarland's posts contain myriad discrete instances of defamation. (See, e.g., SAC ¶ 54.) But they all divide into two categories, the first of which is epithet. This category comprises MacFarland's statements about RainSoft being a "scam," being "shady," engaging in "magic tricks," "bad logic," and such. The second category is made up of MacFarland's more-sober assessments, for example, that RainSoft was guilty of "false promises," "high-pressure sales tactics," and "slightly deceptive practices." This category also includes the purported virulent strain running through MacFarland's posts, namely, the implication that Oster worked for RainSoft, not Basement Technologies – and that therefore MacFarland's venom was misdirected, and willfully so as he knew all along the distinction, but disregarded it to drive traffic to his website.

Before an explanation of why neither category contains tortious statements, just enough of the relevant defamation-law framework to get started, with the introduction of further facets added later on, as needed: under Rhode Island law, suing for defamation means having to prove, among other things, utterance of "a false and defamatory statement." Swerdlick v. Koch, 721 A.2d 849, 859 (R.I. 1998) (quotation marks omitted; emphasis added). A false statement is one whose "gist or . . . sting" is untrue. Healy v. New Eng. Newspapers, Inc., 555 A.2d 321, 325 (R.I. 1989) (quotation marks omitted). A false statement is defamatory if, "in the context of the publication in which [it] appear[s]," and according to its "plain and ordinary meaning in the community in which [it is] published," the statement "tends to degrade [the plaintiff] in society or bring [the plaintiff] into public hatred and contempt." Swerdlick, 721 A.2d at 860 (quotation marks omitted). In this case, truth and falsity play a larger role than defamatory and its opposite.

The First Amendment "overlays" state defamation law, Sindi v. El-Moslimany, 896 F.3d 1, 13 (1st Cir. 2018), and in ways relevant to both categories of purported defamation here. See Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 125 (1st Cir. 1997) ("Our enduring national devotion to freedom of expression, embodied in the First Amendment and renewed in New York Times Co. v. Sullivan, 376 U.S. 254 (1964), inevitably means that much

offensive and inaccurate speech will remain free from legal constraints.").

MacFarland's name-calling – "scam," "shady," "magic show," "bad logic" – is protected by the First Amendment as "imaginative expression" or "rhetorical hyperbole." Milkovich v. Lorain Journal Co., 497 U.S. 1, 17, 20 (1990). As the First Circuit explained this overlay in Levinsky's, "the First Amendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts." 127 F.3d at 128; see also Haynes v. Alfred A. Knopf, Inc., 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.) (noting that a defamatory statement is protected "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts"). Even before glimpsing Internet poetics in full bloom – the Facebook rants, Twitter meltdowns, and Instagram shade – the First Circuit recognized "the reality that exaggeration and non-literal commentary have become an integral part of social discourse." Levinsky's, 127 F.3d at 128. "[T]his category of speech," these "[c]asually used words," are not actionable, the court said, "no matter how tastelessly couched." Id.

The word in Levinsky's was 'trashy,' used by a store manager to describe conditions at a competitor. Id. at 126. The district

13

court found it had but one meaning in this context – "dirty or unkempt" – and connoted something falsifiable. Id. at 129. Upon review, the First Circuit agreed with the district court's premise that "a particular word or phrase ordinarily cannot be defamatory unless in a given context it reasonably can be understood as having an easily ascertainable and objectively verifiable meaning." Id. The court of appeals disagreed, however, with the court below that 'trashy' was such a word. Id. Noting that "the vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be actionable," and 'trashy''s multifaceted semantics, the court held that the word epitomized "loose language that cannot be objectively verified," and was therefore not actionable.[6] Id. at 130; see also Phantom Touring, Inc. v. Affiliated Publ'ns, 953 F.2d 724, 728 (1st Cir. 1992) (holding a theater column's inclusion of a quote describing a play as "a rip-off, a fraud, a scandal, a snake-oil job" was "protected hyperbole"); Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 283-84 (1974) ('traitor' in union literature); Greenbelt Coop. Publ'g Ass'n v. Bresler, 398 U.S. 6, 13-14 (1970) ('blackmail' in local newspaper).

---

[6] As a helpful comparator, the Levinsky's court held that another of the defendant's comments – that its competitor "sometimes put[s] [customers] on hold for 20 minutes" – "was sufficiently factual to be proved true or false," and could thus underwrite a defamation claim. Id. at 131.

MacFarland's use of the words 'scam,' 'magic show,' 'bad logic,' and the like similarly fall into the First Amendment's safe harbor for imaginative expression and rhetorical hyperbole. Any reader of his RainSoft posts would reasonably understand these as metaphor. Cf. Greenbelt Coop., 398 U.S. at 14 ("[E]ven the most careless reader must have perceived that the word ['traitor'] was no more than rhetorical hyperbole, a vigorous epithet . . . ."). For example, although written as post hoc protection against liability and of no legal import, MacFarland's "What is a Scam Anyway?" accurately describes some of the many meanings of the word 'scam.' (PSUF Ex. F at 2–3 (defining scam synonymously using the Wikipedia entry for "Confidence Trick"); see also Merriam-Webster's Collegiate Dictionary 1038 (10th ed. 2002) ("scam . . . : a fraudulent or deceptive act or operation"). Indeed, the First Circuit has already had occasion to mull the word's meaning, and found that it "does not have a precise" one. McCabe v. Rattiner, 814 F.2d 839, 842 (1st Cir. 1987). Hence, "the assertion 'X is a scam' is incapable of being proven true or false." Id.

The rest of MacFarland's complained-of statements are protected by other First Amendment overlays: the concept of false ideas, issues of public concern, and substantial truths. "Under the First Amendment there is no such thing as a false idea," the Court famously stated in Gertz v. Welch, Inc. 418 U.S. 323, 339 (1974). "However pernicious an opinion may seem, we depend for

15

its correction not on the conscience of judges and juries but on the competition of other ideas." Id. at 339-40. Courts have interpreted this to mean that the only opinions at risk of tort liability are those that imply "false assertions of fact." Pan Am Sys., Inc. v. Atl. Ne. Rails and Ports, Inc., 804 F.3d 59, 65 (1st Cir. 2015) (quoting Milkovich, 497 U.S. at 19) (alteration omitted). A corollary being that an opinion whose factual basis is expressed and (substantially) true is protected speech. See Restatement (Second) of Torts § 566 (Am. Law Inst. 1977) ("[A] derogatory opinion . . . [based] on [a] statement of facts that are not defamatory . . . is not subject to liability. . . . The same result is reached if the statement of facts is defamatory but the facts are true . . . .").

In addition to safeguarding most opinions from tort liability, the First Amendment requires that a party who sues over statements regarding issues of public concern prove "that the statements at issue are not substantially true," that is, are "materially false." Pan Am, 804 F.3d at 66, 68 ("[D]efendants cannot be on the hook because . . . the speech deals with an issue of public concern and plaintiffs have not shown the speech (even if false) is materially false.") Statements of public concern are those that "touch on issues in which the public (even a small slice of the public) might be interested, as distinct, say, from purely personal squabbles." Id. at 66. Moreover, statements count as

16

substantially true if they are, in fact, true, but too even if they admit of "[m]inor inaccuracies[,] . . . so long as the substance, the gist, the sting, of the libelous charge be justified." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991) (quotation marks omitted); accord Healey, 555 A.2d at 325.

MacFarland's posts discuss issues of public concern, including water safety, sales tactics, and the efficacy of various filtration systems. Cf. Pan Am Sys., 804 F.3d at 68 (holding that comments regarding "safety, efficiency, and viability of plaintiffs' railway system" was an issue of public concern); Tannerite Sports, LLC v. NBCUniversal News Grp., 864 F.3d 236, 255 n.6 (2d Cir. 2017) (same, regarding report about product allegedly dangerous to the public). And MacFarland's opinions to which RainSoft objects here – including the charge of "false promises," "high-pressure sales tactics," and "slightly deceptive practices" – are all accompanied by their factual bases. For example, MacFarland accuses RainSoft of "what appear to be false promises" only after seven paragraphs where he relates "RainSoft's Money Saving Pitch," as delivered by Oster during his demonstration in MacFarland's home. (See, e.g., PSUF Ex. A at 3–4 (Oster "calculated that people typically replace one appliance a year worth around $365, so that cost is about a dollar a day. . . . He used these numbers to show what we are already spending on water

. . . .").)  MacFarland similarly offered factual bases for his accusation of "high-pressure sales tactics" and "slightly deceptive practices."  (See e.g., id. at 4 ("If we bought today, we'd get 5 years of some free super organic soap and cleaning products.").)

Critically, RainSoft has not genuinely challenged MacFarland's account of Oster's presentation; the company has therefore failed to create a disputed issue whether MacFarland's statements are materially false.  (See PSDF ¶ 25 ("Admitted that Oster delivered a sales presentation . . . using a RainSoft-designed and developed iPad presentation.").)  Without that, the law acts a bulwark against liability for the opinions MacFarland draws from these facts, no matter how unwarranted.  See Riley v. Harr, 292 F.3d 282, 290-91 (1st Cir. 2002) ("[A]n author who fairly describes the general events involved and offers his personal perspective about some of the ambiguities and disputed facts should not be subject to a defamation action." (quotation marks omitted)).  If things were otherwise – as the First Circuit recognized in Riley, where it held that various of Jonathan Harr's opinions found in his tour-de-force A Civil Action could not be grist for a defamation action – "authors would hesitate to venture beyond dry, colorless descriptions of facts, bereft of analysis or insight, and the threat of defamation lawsuits would discourage expressions of opinion by commentators, experts in a field, figures closely

involved in a public controversy, or others whose perspectives might be of interest to the public." Id. (quotation marks omitted). Although unlikely to win a National Book Critics Award, MacFarland's musings are afforded by law the same legal protection as Harr's.

On to the underlying disease infecting MacFarland's posts. Or at least that is how RainSoft construes the fact that MacFarland never distinguished Basement Technologies, for whom Oster worked, from RainSoft. Here RainSoft, even MacFarland conceded, has a point: Basement Technologies is not RainSoft, and therefore it is not true, for instance, that RainSoft was responsible for Oster's "scammy presentation," or that "RainSoft Scammed Me Out of $100." However, as discussed above, not only will "truth . . . set a defendant free," but substantial truth as well. See Pan Am Sys., 804 F.3d at 65, 66.

A statement is substantially true unless "it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Masson, 501 U.S. at 517 (quotation marks omitted). In Pan Am Systems, a railroad trade publication ran an article stating that Pan Am's owner "removed" the company's CEO in a dramatic "coup de grace." Id. at 73. The truth was actually that the CEO had stepped down voluntarily. Id. The substantial truth, though, was the same: the CEO was no longer. Id. at 73-74. "[E]ven assuming any difference suggests

falsity," the First Circuit pointed out, "plaintiffs identify nothing in the summary-judgment record showing their reputations would be changed for the better by a more fulsome account of [the CEO's] leaving." Id. at 74.

An even more-vivid illustration of the relationship between truth and substantial truth can be found in Bustos v. A & E Television Networks, 646 F.3d 762 (10th Cir. 2011). In that case, then-Judge Gorsuch held that a Hispanic prison inmate could not sue a cable-television network for mistakenly describing him as a member of the Aryan Brotherhood, a violent white-supremacist organization. Bustos, 646 F.3d at 762–63. The court granted that this mistake threatened the inmate's life and meant to some that he had "renounced his Hispanic heritage." Id. at 763, 768 (alteration omitted). Nevertheless, the court said, the truth was that the inmate had hung out with members of the Aryan Brotherhood – "In the A & E footage, Mr. Bustos is seen chatting with two Aryan Brotherhood members . . . ." – and had once helped the group smuggle drugs inside the prison. Id. at 767. And this truth was not materially different than what was portrayed in the television segment – not in the eyes, anyway, of the legally favored viewer, that is, "the reasonable member of the (law abiding) contemporary community." Id. at 765. To this person, the court imagined, the difference between being a member, rather than a mere friend, of the Aryan Brotherhood – again, a difference with life-threatening

consequences for those who knew better – was insignificant, the defendant's mistake not actionable for being substantially true. Id. at 767-68; accord Haynes 8 F.3d 1222, 1226-29 (holding allegedly false statement that plaintiff abandoned his children at home nights was substantially true given he "was a heavy drinker, a bad husband, a bad father"); Nichols v. Moore, 477 F.3d 396, 401 (6th Cir. 2007) (holding allegedly false statement that authorities "arrested [plaintiff] in connection with the [Oklahoma-City] bombing" was substantially true given he was "held as a material witness in connection" with the bombing).

These examples convince the Court that MacFarland's elision did not make his RainSoft posts materially false: Basement Technologies was under contract to sell only RainSoft products, and to "protect," "embrace," and "promote" the RainSoft brand "in every customer facing opportunity" to ensure that someday "every person in the world [would] recognize the RainSoft® trademark." Those to whom Basement Technologies sold were considered customers "shared" with RainSoft – a fact highlighted when RainSoft reimbursed MacFarland the $100 he lost in the soap-option contretemps. RainSoft, moreover, trained employees of Basement Technologies to sell products; they were told how to greet customers over the phone with a salutation that would have included Basement Technologies presenting itself as "your local RainSoft Dealer." Basement Technologies was basically a de facto arm of

RainSoft.  That the two were separate legal entities surely mattered to RainSoft – it stakes much of the current suit on this distinction, after all – but not to an upstanding member of the web-surfing public.  The difference between a company and its outsourced foot soldiers – who were "expect[ed] and count[ed] on . . . [to] support" the "organization" they had "becom[e] part of" – is just too fine to have piqued public concern.  MacFarland saved again by substantial truth.

B.  Lanham Act

RainSoft also brings a Lanham Act claim, alleging false advertising, and relying on some of the same statements discussed in the preceding section – "scam," "magic show" – to argue that MacFarland unfairly competed with the company.  See 15 U.S.C. § 1125(a)(1)(B); POM Wonderful LLC v. Coca-Cola Co., 134 S. Ct. 2228, 2234 (2014) ("[T]he Lanham Act's purpose [is] protecting persons engaged in commerce within the control of Congress against unfair competition." (alterations and quotation marks omitted)).

There are several elements a Lanham Act plaintiff must show to prove false advertising.  First on the list is usually the requirement to demonstrate "the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product." Cashmere & Camel Hair Mfrs. Inst. v. Sax Fifth Ave., 284 F.3d 302, 310–11 (1st Cir. 2002).  Nested within this element, and therefore

also necessary to prove a Lanham Act violation, is the test for what constitutes a "commercial advertisement," which has at least three parts[7]:  the representation must "(a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services . . . and [c] disseminated to the consuming public in such a way as to constitute 'advertising' or 'promotion.'"  Podiatrist Ass'n v. La Cruz Azul de P.R., Inc., 332 F.3d 6, 19 (1st Cir. 2003).

RainSoft's Lanham Act claim fails because there is no dispute as to whether MacFarland intended his posts to sell products of his.  Cf. Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, 08cv0442(DLC), 2016 WL 815205, at *7–8 (S.D.N.Y. Feb. 29, 2016) (finding Lanham Act liability where laser-hair-removal business anonymously posted fictitious, disparaging comments about competitor on consumer-advocacy websites to increase sales).  It is undisputed that MacFarland sold advertising space on his site, and that he would receive some monetary benefit from readers clicking through and buying products featured in the hyperlinks found in his posts. (DSUF ¶¶ 4–8, 133–137.)  But the only product

---

[7] What used to be a fourth part – that the speech be "by a speaker who is a competitor of the plaintiff," Podiatrist Ass'n, 332 F.3d at 19 – was implicitly dispensed with by the Court in Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 129–32 (2014).  See Handsome Brook Farm, LLC v. Human Farm Animal Car, Inc., 700 F. App'x 251 256–57 (4th Cir. 2017).

MacFarland can be said to have sold readers is his advice, which they got for free.[8]  See Tobinick v. Novella, 848 F.3d 935, 951 (11th Cir. 2017) (holding that Lanham Act claim fails in part because blog posts at issue "do not discuss any products for sale by [defendant]").  Not only is there no evidence to support a finding of the requisite intent to sell, it is not at all clear that MacFarland's posts even constitute commercial speech, in other words, "expression related solely to the economic interests of the speaker and its audience." Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980).

Tobinick provides a helpful analog.  There a dermatologist sued a neurologist for libel and a Lanham Act violation over statements the neurologist made in a post hosted by a blog called "Science-Based Medicine." Tobinick, 848 F.3d at 940–41.  The post criticized the dermatologist's novel method for administering an arthritis medication, and accused him of running "quack clinics." Id.  After the dermatologist sued, the neurologist wrote a follow-up reiterating his criticism and complaining that the dermatologist was using litigation to silence legitimate criticism

_____

        [8] RainSoft has not argued that MacFarland's paying customers – the companies who advertise on his blog – are the focus of its Lanham Act claim.  The result would likely be the same if they had:  there is no evidence that any of MacFarland's alleged misrepresentations had a "tendency to deceive" his advertisers. See Cashmere & Camel Hair, 284 F.3d at 311 (listing "tendency to deceive a substantial segment of [an advertisement's] audience" as another element of a successful false-advertising claim).

24

of his practices. Id. The court ended up affirming summary judgment in favor of the neurologist on the Lanham Act claim: it found that the posts, as a matter of law, were not commercial speech, "as they d[id] not propose a commercial transaction." Id. at 950. "Instead, [the] articles evoke[d] many characteristics of noncommercial speech. [They] 'communicated information, expressed opinion, [and] recited grievances . . . .'" Id. (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 266 (1964) (alteration omitted). The posts had an "educational purpose," the court felt, and "add[ed] to the public debate regarding the viability of a non-FDA approved medical treatment and [were] clearly of import to the public." Id.

The purported purpose of lazymanandmoney.com is likewise to educate people, specifically to inform them of ways to save money or spend it wisely, which the content of MacFarland's RainSoft posts does nothing to contradict. (See, e.g., PSUF Ex. D at 6 ("You will have saved yourself thousands and thousands of dollars before just trusting the RainSoft Salesman.").) That MacFarland is not Dr. Steven Novella, neurologist at Yale New Haven Hospital, and instead a man with an armchair and an Internet connection who claims to "know [his] way around a scam or two," does not abrogate this purpose or transform his musings into commercial speech. (PSUF Ex. C at 2.)

Neither does the fact that MacFarland makes money from his guidance, either by running ads or receiving promotional kickbacks. If running ads were sufficient to make copy commercial speech, every newspaper article could be subject to Lanham Act liability – an absurdity whose coming the Supreme Court has already prevented: "[i]f a newspaper's profit motive were determinative, all aspects of its operations – from the selection of news stories to the choice of editorial position – would be subject to regulation if it could be established that they were conducted with a view toward increased sales." Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 385 (1973). "Such a basis for regulation," the Pittsburgh Press Court said, "clearly would be incompatible with the First Amendment." Id.

The kickback revenue MacFarland generated – as a member of Amazon.com's Associates Program – through hyperlinks to products sold by Amazon is not enough to turn his speech commercial, either. See Tobinick, 848 F.3d at 951 (rejecting argument that hyperlinks to websites generating revenue for defendant demonstrated sufficient economic motivation in commercial-speech analysis). The hyperlinks were clearly incidental to his objective of providing consumers information. (See, e.g., PSUF Ex. D at 5 (displaying hyperlinks to filtration products that together, in MacFarland's estimation, "would appear to be [a] formidable water purification system . . . [at] less than 1/6 the cost of what

RainSoft was going to charge me").) MacFarland's customers were his readers, regardless of whether they clicked through to buy something from Amazon. (See DSUF Ex. W at 3, ECF No. 88-23 ("Our [Amazon's] customers are not, by virtue of your participation in the Associates Program, your customers.").)

III. Conclusion

The First Amendment speaks to the sometimes-conflicting impulses of liberty and equality, ensuring the "breathing space," NAACP v. Button, 371 U.S. 415, 433 (1963), necessary for debate that is "uninhibited, robust, and wide-open," Sullivan, 376 U.S. at 270: it protects us while we freely discuss how we should live and love, how to wage war and keep peace, how best to govern ourselves. And equally, or almost, how to filter tap water on a budget. For this reason, and those above, summary judgment is GRANTED MacFarland on all counts.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  September 30, 2018